**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No: 3:20CV00259**

| | |
|---|---|
| **THE CHARLOTTE MECKLENBURG BOARD OF EDUCATION,** | |
| **Plaintiff,** | **DEFENDANT 34 ED, LLC d/b/a CENTEGIX'S MEMORANDUM IN SUPPORT OF MOTION TO STAY OR, ALTERNATIVELY, TO DISMISS THIS ACTION** |
| **v.** | |
| **34 ED, LLC d/b/a CENTEGIX,** | |
| **Defendant.** | |

34 ED, LLC d/b/a CENTEGIX ("Centegix" or "Defendant") and the Charlotte Mecklenburg Board of Education ("CMBE" or "Plaintiff") are parties to an agreement under which Centegix supplied and installed a crisis alert system at several CMBE schools. One of the parties' contract documents, a Scope of Work Agreement, signed by the CMBE Chief Technology Officer, requires arbitration of *"[a]ny controversy or claim"* arising out of the parties' agreement, including *"any dispute as to the enforceability"* of the arbitration clause before the American Arbitration Association ("AAA") in Oconee County, Georgia. CMBE and Centegix executed the Scope of Work Agreement as an amendment to the contract CMBE pleads was formed by its August 2018 Request for Proposals (the "First RFP"), Centegix's September 12, 2018 bid in response to the First RFP, and the CMBE Standard Terms and Conditions, which CMBE has identified as "the written agreement between the parties." *See* CMBE Complaint (Doc. 1) ("Compl.") ¶ 13.

Notwithstanding this binding agreement to arbitrate, CMBE filed this action. Centegix files this Motion to Stay or, Alternatively, to Dismiss this Action to vindicate its right to arbitrate.

The restrictions of the FAA, however, prevent this Court from granting Centegix complete relief by compelling arbitration to take place in Georgia. For that reason, Centegix filed a Petition to Compel Arbitration in the United States District Court for the Middle District of Georgia. Based on judicial economy and interests of comity, this Court should defer to the Georgia federal court and stay this action pending its decision. Alternatively, if this Court decides to address the arbitrability issues, it should stay this lawsuit pending the parties' arbitration in Georgia, pursuant to 9 U.S.C. § 3.

Additionally, absent amendment of the parties' contract, CMBE's Standard Terms and Conditions, while permitting lawsuits, required that the parties engage in mediation before the AAA "before resorting to litigation." *See* Compl. Ex. A at p. 23. If the Court accepts CMBE's argument that the Scope of Work Agreement is not effective, this lawsuit must be dismissed (or, alternatively, stayed) because CMBE did not mediate with Centegix before filing with the Court. Finally, solely to preserve Centegix's rights under Rule 12(b) of the Federal Rules of Civil Procedure, and as an additional alternative motion, Centegix moves for dismissal of CMBE's claims under the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 *et seq*. (the "NCUDTPA") because they are indistinct from CMBE's contract and warranty claims and because CMBE failed to plead any fraud with particularity.

## I.    BACKGROUND AND FACTS

Centegix is a limited liability company organized under the laws of the State of Delaware. Its principal place of business is in Atlanta, Georgia, and its principal office is in Athens, Georgia. *See* Compl. ¶ 2. CMBE is a local government entity organized under the laws of North Carolina and operating a public school system in Mecklenburg County, North Carolina. Compl. ¶ 1.

2

CMBE's claims against Centegix center on Centegix's sale to CMBE and installation at several CMBE schools of a crisis alert and management system. *See, e.g., id.* ¶ 6.

A.     CMBE and Centegix's Agreement to the Purchase and Sale of the Crisis Alert System.

According to the Complaint, CMBE issued its First RFP, No. 163-1484, "[o]n or about, August 31, 2018." Compl. ¶ 6 & Ex. A.[1] The First RFP states that "All bids are subject to the provisions of the Instructions to Bidders, special terms and conditions specific to this Invitation to Bids, the specifications, and The Charlotte-Mecklenburg Board of Education Standard Contract Terms and Conditions." *Id*. at p. 16. The Charlotte-Mecklenburg Board of Education Standard Terms and Conditions (also a part of the First RFP), in turn, provide, in part:

> CMBE hereby expressly rejects all such provisions which supplement, modify or otherwise vary from the terms of the Contract Documents, and such provisions are superseded by the terms and conditions stated in the Contract Documents, ***unless and until CMBE's authorized representatives expressly assent, in writing, to such provisions***.

*Id*. at p. 19 (emphasis added). Centegix submitted its proposal in response to the First RFP on September 5, 2018. Compl. ¶ 8 & Ex. B.

According to the Complaint, CMBE accepted Centegix's proposal on November 13, 2018. Compl. ¶ 12. The Complaint alleges that, upon CMBE's acceptance of Centegix's bid, the parties formed a written contract. CMBE alleges:

> Accordingly, as provided in the RFP, once [CMBE] accepted [Centegix's] Bid and awarded [Centegix] the RFP, the following documents, collectively became the written agreement between the parties: (a) the Bid; (b) the RFP; and (c) The Charlotte Mecklenburg Board of Education Standard Terms and Conditions (hereinafter, collectively referred to as "Bid Agreement #1).

Compl. ¶ 13.[2]

---

[1] The "Commodity" CMBE listed in its First RFP was "Classroom Video System," although the specifications contained in the request included items related to the "Crisis Alert System." *See* Compl. Ex. A at p. 9.

[2] Centegix accepts for purposes of this motion that these documents, as CMBE alleges, formed an enforceable written contract to purchase and sell the crisis alert system and other equipment. CMBE, however, has taken the position

Omitted from CMBE's Complaint is any mention of the next contract document between CMBE and Centegix. After entering into the contract referenced in CMBE's Complaint, CMBE, acting through its Chief Technology Officer, Derek Root, and Centegix, through its officer Michael Dooley, executed the Scope of Work Agreement, an amendment to the parties' agreement. *See* CMBE's Memorandum of Law in Support of Motion to Enjoin Arbitration Proceedings (Doc. 3) ("Memo. Supp. Mot. Enj.") Ex. B.[3] Michael Dooley signed the Scope of Work Agreement on November 16, 2018, and Derek Root signed the document on December 4, 2018. Memo. Supp. Mot. Enj. Ex. B at p. 11. The Scope of Work Agreement contains a broad arbitration clause, providing, in relevant part:

> Any controversy or claim arising out of or relating to this Agreement or breach thereof, including any dispute as to the enforceability of this arbitration provision, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, in Oconee County, Georgia.

Memo. Supp. Mot. Enj. Ex. B, at p. 10.[4]

B.     The Parties' Claims and Proceedings.

On February 12, 2020, CMBE General Counsel André Mayes sent counsel for Centegix, Robert E. Harrington, a demand letter stating that Centegix "was awarded the bid contract under

---

elsewhere that it did not sign a written contract with Centegix, *see* Stevens Decl. Ex. 1, in which case CMBE's claims against Centegix would appear to be based solely on a series of individual purchase orders. Indeed, in a public meeting, CMBE Superintendent Earnest Winston stated, "In terms of the [Centegix] contract, purchase orders actually were used for this particular project, which is allowable." Joint Meeting of Mecklenburg County Board of County Commissioners and CMBE, January 22, 2020 (available at https://mecklenburg.ravnur.com/media/560, starting at the 11:30 mark of the video).

[3] The Scope of Work Agreement identifies the "End User" and "Client" as "Charlotte Mecklenburg Schools", the "Provider" as Centegix, and the "Project" as "Crises Alert Solution." Derek Root, the CMBE Chief Technology Officer, signed the agreement for CMBE. *See* Memo. Supp. Mot. Enj. Ex. B, at 1 & 11.

[4] Between November 2018 and April 2019, CMBE issued purchase orders related to the crisis alert system. *See* Declaration of Matthew Stevens ("Stevens Decl.") ¶ 4 (filed herewith). The Scope of Work Agreement states that "[t]he terms on any purchase order or similar document submitted by Client to CENTEGIX will have no effect on any terms and conditions herein." Memo. Supp. Mot. Enj. Ex. B at p. 5. CMBE alleges that it issued a second request for proposals in March 2019 for a separate group of schools. Compl. ¶ 20. CMBE, however, concedes that, "[a]s of the date of th[e] Complaint, neither party has taken any action or performed under [this second RFP]," Compl. ¶ 25, and that RFP does not appear to be relevant to this dispute over arbitration.

which [it] agreed to provide crisis alert and management systems in CMS schools." Declaration of Robert E. Harrington ("Harrington Decl.") ¶ 3 & Exhibit 1 (filed herewith). CMBE claimed that Centegix's actions breached warranties owed to the school system. Harrington Decl. Ex. 1. CMBE purported to "end[] its relationship with CENTEGIX" and demand repayment of all monies received by Centegix "pursuant to the bid contract." *Id.* Subsequently, on March 6, 2020, Harrington responded on Centegix's behalf, denying any breach of the parties' agreement by Centegix and demanding that CMBE pay Centegix the full amount remaining unpaid under the parties' agreement. *See id.* Ex. 2.

On April 29, 2020, CMBE filed its Complaint, seeking recovery against Centegix for breach of contract (Claim 1), breach of warranties (Claims 2-5), and violation of the NCUDPTA, all allegedly arising from Centegix's sale and installation of the "crisis alert and management system" in CMBE schools. Later that same day, after learning of CMBE's complaint, Centegix filed a Demand for Arbitration with the AAA under its Commercial Arbitration Rules seeking an arbitration hearing in Oconee County, Georgia, based on the parties' agreement to arbitrate. *See* Memo. Supp. Mot. Enj. at 1 & Ex. A In that arbitration demand, Centegix seeks to recover the unpaid balance of the contract price for the crisis alert system and related damages from CMBE. Finally, because CMBE has shown its intention not to arbitrate these claims in accordance with the arbitration provision in the Scope of Work Agreement and this Court cannot compel arbitration outside of this federal district, *see, e.g., U.S. ex rel. TGK Enterprises, Inc. v. Clayco, Inc.*, 978 F. Supp. 2d 540, 551 (E.D.N.C. 2013), on May 5, 2020, Centegix filed a Petition to Compel Arbitration, pursuant to 9 U.S.C. § 4, in the United States District Court for the Middle District of Georgia. Memo. Supp. Mot. Enj. at 1-2 & Exs. C, D.

## II.   LAW AND ARGUMENT

A.   The Georgia Federal Court Should Decide the Arbitrability Issues Because Only It Can Give Complete Relief.

Because the United States District Court for the Middle District of Georgia can provide the full relief Centegix seeks in response to CMBE's improvidently filed lawsuit, and this Court cannot, this Court should defer to the Georgia federal court to decide the arbitrability issues in this dispute.  Section 4 of the FAA requires a federal court to compel arbitration upon a finding that a party has failed to comply with a "written agreement for arbitration."  Section 4, however, limits the court's authority to compel arbitration to the court's federal district:  "The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed."  9 U.S.C. § 4.

In the memorandum supporting its Motion to Enjoin Arbitration Proceedings, CMBE argues, citing *American International Specialty Lines Ins. Co. v. A.T. Massey Coal Co.*, 628 F. Supp. 2d 674 (E.D. Va. 2009), that "the Fourth Circuit has not specifically ruled on 'whether pursuant to § 4 of the FAA, a district court has the authority to *compel* arbitration outside of its geographic jurisdiction."  *See* Memo. Supp. Mot. Enj. at 4 (emphasis added).  In fact, the *American International* court was much clearer regarding its interpretation of FAA section 4.  It expressly adopted the majority rule that a court may not compel arbitration if the arbitration agreement requires arbitration beyond its district and observed that "the Fourth Circuit has strongly *implied* that it would align itself with the majority position if it were squarely presented with the issue."  *American International*, 628 F. Supp. 2d at 683 (emphasis in original; citing *Elox Corp. v. Colt Industries, Inc.*, 1991 WL 263127 at *1 (4th Cir. 1991)).  District courts in the Fourth Circuit, including this district, have consistently agreed with this position.  *See., e.g., Southern Concrete Products, Inc. v. ARCO Design/Build, Inc.*, 2012 WL 1067906 at *8 (W.D.N.C. March 29, 2012)

6

(concluding that it lacked jurisdiction to compel arbitration in St. Louis under the parties' arbitration agreement).[5]

While CMBE cites a Ninth Circuit opinion for the notion that the Court should enjoin the arbitration Centegix has filed in Georgia, *see* Memo. Supp. Mot. Enj. at 5-6 (citing *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781 (9th Cir. 2001)), the most efficient manner to address this situation is reflected in two opinions issued in a dispute involving Jefferson Pilot Life Company and one of its putative employees. In *Griffin v. Lincoln Nat'l Corp.*, 2007 WL 2713237 (D. Ariz. Sept. 17, 2007), the plaintiff sued in the United States District Court for the District of Arizona claiming the defendants committed breach of contract and various torts. In response, the defendants moved to stay pending arbitration and filed an action in the United States District Court for the Middle District of North Carolina to declare the parties' arbitration enforceable and compel arbitration in North Carolina under the parties' arbitration agreement.

The Arizona court concluded that the arbitration issues in both courts were identical and that the presence of the same parties and identical issues "raise[d] issues of comity." 2007 WL 2713237 at *4. The Court acknowledged the risk of inconsistent rulings and the inefficient use of judicial resources in the absence of a stay. *Id.* The court also questioned whether it could compel arbitration in North Carolina. *Id.* at *2 n.1. The court stayed the Arizona lawsuit pending a decision from the North Carolina federal court. The Middle District of North Carolina, in turn, considered the application of the first-filed rule and concluded, under the circumstances, that it should decide the issue of arbitrability. *Jefferson Pilot Life Ins. Co. v. Griffin*, 2008 WL 2485598, *5 (M.D.N.C. June 16, 2008). *See also Roe v. Gray*, 165 F. Supp. 2d 1164, 1173 (D. Colo. 2001)

---

[5] *Accord United States ex rel. TGK Enterprises, Inc. v. Clayco, Inc.*, 978 F. Supp. 2d 540, 551-52 (E.D.N.C. 2013) (concluding the court could not compel arbitration to take place in St. Louis); *Wake County Bd. of Educ. v. Dow Roofing Sys. LLC*, 792 F. Supp. 2d 897, 904 (E.D.N.C. 2011) (concluding that the court could not compel arbitration to take place in Massachusetts).

(holding that, because the court in the federal district home to the arbitration venue would decide the motion to compel arbitration, it should decide the arbitrability issues). The North Carolina court noted that it unquestionably had jurisdiction to compel arbitration to take place in this state and observed that "there may be some doubt as to whether the Arizona federal court had the authority to compel arbitration in North Carolina." *Id*. at *4-5. The court concluded that "[t]his observation provides further justification for the Court's departure from the first-filed rule." *Id*. at *4. The court retained jurisdiction, decided the arbitrability issues, and compelled arbitration to take place in North Carolina consistent with the parties' agreement. *Id*. at *5-7.

Given this Court's lack of authority under the FAA to compel arbitration in Georgia consistent with the Scope of Work Agreement and the Georgia federal court's ability to grant full relief on the arbitration issues—to decide the arbitrability issues and compel arbitration, the Court should follow the Jefferson Pilot case precedent, stay this action, and defer to the United States District Court for the Middle District of Georgia for resolution of the arbitration issues.

B.      CMBE Is Bound to Arbitrate this Dispute.

If the Court decides to address the merits of the parties' dispute over arbitration, it should conclude that all issues between the parties, including those pertaining to arbitrablity, must be submitted to arbitration, and stay this action, pursuant to Section 3 of the FAA, pending conclusion of arbitration. The Scope of Work Agreement is a valid and enforceable amendment to the CMBE-Centegix contract, and the FAA's policy favoring arbitration requires that it be enforced.

1.      The Federal Arbitration Act Reflects a Strong Federal Policy Favoring Enforcement of Agreements to Arbitrate.

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. (the "FAA"), governs the validity and enforceability of agreements to arbitrate. The FAA provides:

> A written provision in a . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract.

The Supreme Court interprets the "involving commerce" provision in 9 U.S.C. § 2 and the "affecting commerce" provision of the Commerce Clause as functional equivalents, "words of art that ordinarily signal the broadest permissible exercise of Congress's *Commerce Clause* power. *Citizens Bank v. Alfabco, Inc.*, 539 U.S. 52, 56, 123 S. Ct. 2037, 2340 (2003) (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 274, 115 S. Ct. 834, 840 (1995)). Here, Centegix, a company with its principal place of business in Atlanta, Georgia, *see* Compl. ¶ 2, contracted with CMBE, a North Carolina local governmental entity, to supply a crisis alert and management system to its public school system in Mecklenburg County, *see id*. ¶¶ 1, 6. The parties' transaction "involve[s] commerce" for purposes of 9 U.S.C. § 1, and the FAA governs this motion. *See Benezra v. Zacks Inv. Research, Inc.*, 2012 WL 1067559, *3 n. 1 (M.D.N.C. Mar. 30, 2012) (concluding a transaction involved commerce where the parties resided in different states and the transactions in question were conducted across state lines through interstate commerce).

The FAA reflects a strong "policy favoring arbitration agreements," *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765, 784-85 (1983), and dictates that all courts "rigorously enforce agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1238, 1242, 84 L. Ed. 2d 158, 265 (1985). The FAA and its policy favoring enforcement of agreements to arbitrate preempt any contrary state law. *Allied-Bruce Terminix*, 513 U.S. at 271-72, 115 S. Ct. at 838 (citing *Southland Corp. v. Keating*, 465 U.S. 1, 15-16, 104 S. Ct. 852, 860-61 (1984)). Both Georgia law and North Carolina law reflect similar policies favoring arbitration. *See* O.C.G.A. § 9-9-6(a); *Web IV, LLC v. Samples Constr., LLC*, 349 Ga. App. 607, 609, 824 S.E.2d 107, 110 (2019), *reconsideration*

*denied* Mar. 20, 2019 ("The GAC, like its federal counterpart, reflects a 'clear public policy in favor of arbitration.'"); *Futrelle v. Duke Univ.*, 127 N.C. App. 244, 247, 488 S.E.2d 635, 638 (1997).

Therefore, upon finding a written agreement to arbitrate, section 3 of the FAA requires that this action be stayed pending arbitration. That section states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding in referable to arbitration under such an agreement, ***shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant is not in default in proceeding with such arbitration***.

9 U.S.C. § 3 (emphasis added.) Granting Centegix's requested stay pending arbitration is mandatory. *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (observing that 9 U.S.C. § 3's "stay-of-litigation provision is mandatory"); *Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 937 (4th Cir. 1999) (observing that, "[w]hen a valid agreement to arbitrate exists between the parties and covers the dispute, the FAA commands the federal courts to stay any ongoing judicial proceedings").

    2.    <u>CMBE Validly Executed the Scope of Work Agreement, Amending the Parties Initial Written Contract</u>.

In the Scope of Work Agreement, CMBE and Centegix validly amended the contract formed form when CMBE's accepted Centegix's bid. *See* Compl. ¶ 13. The Scope of Work Agreement unambiguously requires arbitration of this dispute, including questions of arbitrability. CMBE's challenges to the Scope of Work Agreement and its arbitration clause should be rejected.

a.  The Absence of a "Pre-Audit Certification" on the Scope of Work Agreement Does Not Render It Void.

In the memorandum supporting its motion to enjoin the arbitration proceedings, CMBE argues that the Scope of Work Agreement cannot be enforced because the lack of a "preaudit certificate" renders it "void *ab initio*." Memo. Supp. Mot. Enj. at 14. CMBE's position on the preaudit certificate misstates its purpose and overstates the consequences of its absence. The statute addressing preaudit certificates in public elementary and secondary school contracts is N.C.G.S. § 115C-441(a). Section 115C-441(a) is "essentially identical" to a separate statute, N.C.G.S. § 159-28(a), which addresses preaudit certificates in other North Carolina public contracts. *See Transp. Servs. of North Carolina, Inc. v. Wake County Board of Education*, 198 N.C. App. 590, 591, 680 S.E.2d 223, 224 (2009).[6] Section 115C-441(a) states:

(a)  Incurring Obligations.—Except as set forth below, no obligation may be incurred by a local school administrative unit unless the budget resolution includes an appropriation authorizing the obligation and an unencumbered balance remains in the appropriation *sufficient to pay in the current fiscal year the sums obligated by the transaction for the current fiscal year*. Nothing in this section shall require a contract to be reduced to writing.

(a1)  Preaudit Requirement.—If an obligation is reduced to a *written contract or written agreement requiring the payment of money*, or is evidenced by a purchase order for supplies and materials, the written contract, agreement, or purchase order shall include on its face a certificate stating that the instrument has been preaudited to assure compliance with subsection (a) of this section. The certificate, which shall be signed by the finance officer, shall take substantially the following form:

"This instrument has been preaudited in the manner required by the School Budget and Fiscal Control Act.

(Date)

(Signature of finance officer)"

N.C.G.S. § 115C-441(a) (emphasis added).

---

[6] In *Transportation Services*, the North Carolina Court of Appeals expressly relied on case law interpreting Section 159-29(a) to interpret Section 115C-441(a). *See* 198 N.C. App. at 591, 680 S.E.2d at 224.

The statute addresses only written contracts and agreements that require the payment of money. It is intended to assure the school board is able to pay amounts due during the fiscal year in which the contract is entered from that year's budget. Judge James Wynn, when a member of the North Carolina Court of Appeals, made this clear in *Myers v. Town of Plymouth*, 135 N.C. App. 707, 522 S.E.2d 122 (1999), a case involving the analogous provisions of N.C.G.S. 159-28(a):

> The purpose of the pre-audit certificate is to ensure that a town is has enough funds in its budget to pay its financial obligations.
>
> The language of the statute makes the pre-audit certificate a *requirement* when a town will have to satisfy an obligation in the fiscal year in which a contract is formed.

135 N.C. App. at 713, 522 S.E.2d at 126 (emphasis in original). In *Myers*, the court of appeals held that the absence of a preaudit certificate from an employment contract containing a severance payment provision **did not render the contract void** because the payment would not be made during the fiscal year the contract was executed. 135 N.C. App. at 714, 522 S.E.2d at 126.

Similarly, in *Finger v. Gaston County*, 178 N.C. App. 367, 631 S.E.2d 171 (2006), the North Carolina Court of Appeals observed that Section 159-28(a) reflects a "policy determination to forbid counties from entering into **contracts for payment of money** that lack a preaudit certificate." 178 N.C. App. at 371, 631 S.E.2d at 174 (emphasis added; concluding that the absence of a preaudit certificate rendered a contract void where payment would be due upon execution of the agreement). This Court made a similar observation in *Patterson v. Graham County*, 2009 WL 10726656, *5-6 (W.D.N.C. Nov. 4, 2009) (quoting *Myers* and concluding that the absence of a preaudit certificate did not render a severance payment agreement invalid). In *Transportation Services*, which CMBE cites, the court of appeals observed as to Section 159-28(a) and Section

12

115C-441, "Although each statute applies to a different type of governmental entity, both statutes deal with the same subject matter: ***contracts with a unit of government that require the payment of money.***"  198 N.C. App. at 595, 680 S.E.2d at 226 (emphasis added).

The Scope of Work Agreement is an amendment to the contract upon which CMBE bases its Complaint.  It contains no separate payment obligations and does not change the payment obligations contained in the underlying agreement.  In contrast, *Transportation Services*, upon which CMBE relies, focused on a contract to pay a transportation company to transport students. That contract lacked a preaudit certificate.  The court concluded that the absence of a preaudit certificate in that document rendered the agreement, "necessarily, void."  198 N.C. App. at 599, 680 S.E.2d at 228.

In cases in which the disputed contract document has not required the governmental entities to pay money, the absence of a preaudit certificate has not caused courts to void contracts.  *See Myers*, 135 N.C. App. at 713-14, 522 S.E.2d at 126 (declining to void employment contract contemplating payment of severance in future year); *Lee v. Wake County*, 165 N.C. App. 154, 162-63, 598 S.E.2d 427, 433 (2004) (declining to void mediation memorandum of agreement that anticipated preparation of formal settlement agreement); *Patterson*, 2009 WL 10726656 at *5-6 (declining to void employment contract contemplating severance payment in future year); *Naphcare, Inc. v. Guilford County*, 2008 WL 4371770, *5-6 (M.D.N.C. Sept. 18, 2008) (declining to void contract providing for future contingent payments under a healthcare services contract). The preaudit certificate therefore does not apply to the Scope of Work Agreement.

      b.    <u>Derek Root Validly Executed the Scope of Work Agreement on CMBE's Behalf</u>.

In addition to arguing that the Scope of Work Agreement is ineffective because it lacks a preaudit certificate, CMBE has contended that the Scope of Work Agreement cannot be enforced

because Derek Root—the CMBE Chief Technology Officer—lacked authority to execute this amendment to a technology contract on CMBE's behalf. *See* Memo. Supp. Mot. Enj. at 9-12. CMBE's argument misses the mark. The Standard Terms and Conditions that CMBE argues form part of the parties' initial contract, *see supra* at 2-3, expressly anticipate amendment:

> CMBE hereby expressly rejects all such provisions which supplement, modify or otherwise vary from the terms of the Contract Documents, and such provisions are superseded by the terms and conditions in the Contract Documents, ***unless and until CMBE's authorized representatives expressly assent, in writing, to such provisions***.

Compl. Ex B, at p. 19 (emphasis added).

CMBE's principal contact in connection with its acquisition of Centegix's crisis alert system was Derek Root, the CMBE Chief Technology Officer. Root led a group of CMBE representatives who spent two days in Georgia in December 2017 on a site visit with Centegix at Gwinnett County and Newton County schools. Declaration of Daniel Dooley ("Dooley Decl.") ¶ 3 (filed herewith). The following month, Root met with Centegix representatives in Charlotte to further discuss crisis alert system. *Id.* ¶ 4. Clayton Wilcox, the former CMBE Superintendent, indicated that Root was designated with responsibility for the project and that Centegix should go through Root on matters related to the project. *Id.* ¶ 6. Nonetheless, CMBE contends that Root (i) did not sign the Scope of Work Agreement on CMBE's behalf, Memo. Supp. Mot. Enj. at 9, and (ii) in any event, Root lacked authority to sign the Scope of Work Agreement on CMBE's behalf, *id.* at 9-13. On its face, the Scope of Work Agreement was between Centegix and Charlotte Mecklenburg Schools, the "End User." *See* Memo. Supp. Mot. Enj. Ex. B, p. 1. It is signed by Root and by Michael Dooley, on Centegix's behalf. *Id.* p. 11. Root clearly signed the Scope of Work Agreement on CMBE's behalf.

To support its authority argument, CMBE relies on several cases holding that a party to a transaction with a public body is deemed to know any limitations on the authority of the representative of the public body with which it deals. As the North Carolina Court of Appeals stated in *L & S Leasing, Inc. v. City of Winston-Salem*, 122 N.C. App. 619, 471 S.E.2d 118 (1996):

> Furthermore, "'[t]he law holds those dealing [with a City] to a knowledge of the extent of the power … and of any restrictions imposed … [P]ersons dealing with a municipal corporation are charged with notice of all limitations upon the authority of its officers representing them….'" ***This is because the scope of such authority is a matter of public record***.

122 N.C. App. at 622, 471 S.E.2d at 120 (emphasis added). In *L & S Leasing*, the record established that the city's board of aldermen had not vested the representative with authority to execute a contract with the plaintiff. *Id*. There, the public record was clear: a provision of the Winston-Salem city code expressly declared it to be unlawful for an employee of the city to make any contract on its behalf "unless upon the resolution of the board of aldermen." *Id*. Similarly, in *Karagiannopoulos v. City of Lowell*, 2008 WL 2447362 (W.D.N.C. June 13, 2008), the court concluded that, under city zoning ordinances, a city officer was not authorized to commit the city to a zoning amendment because, the court found, such an amendment was required to be considered by the city's planning board, subject to a public hearing before the city council, and voted upon by the council. *Id*. at *2 n.3. In *Cmty. Projects for Students, Inc. v. Wilder*, 60 N.C. App. 182, 298 S.E.2d 434 (1982), the court relied on a state statute to conclude that two purchase orders signed by a teacher did not qualify as a contract between the school board and the plaintiff. 60 N.C. App. at 184, 298 S.E.2d at 435.[7]

---

[7] The *Cmty. Projects* court relied upon N.C.G.S. § 115-52 (now codified at N.C.G.S. 115C-522), which required no contracts to be made by a school board unless provision was made in the school board's budget for the obligation or surplus funds were on hand to cover the obligation. *See* 60 N.C. App. at 183-84, 298 S.E.2d at 435. This statute is not relevant here, where (i) no issue has been raised as to the availability of funds to cover a debt, and, in any event (ii) the Scope of Work Agreement did not create the CMBE payment obligation.

As to the public record here, CMBE points to North Carolina General Statutes Chapter 143 and a CMBE policy on Purchasing/Contracting, Memo. Supp. Mot. Enj. Ex. I, as reflecting limitation of Root's authority to execute the Scope of Work Agreement. Unlike the public record in *L & S Leasing* and *Karagiannopoulos*, these materials do not establish that Root lacked authority to execute the Scope of Work on CMBE's behalf. N.C.G.S. § 143-129(a) states that a governing public body may delegate the authority to award contracts for equipment to "the manager, school superintendent, chief purchasing officer, or other employee." Section 143-129(c) requires that such contracts be in writing and permits them to be amended by written agreement between the seller and the public body.[8]

The CMBE Purchasing/Contracting policy, in turn, permits the superintendent and the CMBE board chair to designate a representative to execute contracts. Memo. Supp. Mot. Enj. Ex. I, § D. The public record does not indicate whether the Chief Technology Officer had been designated—or not designated—to execute the documents related to the Crisis Alert system. Apparently for that reason, CMBE has now sought to supplement the record with affidavits to that effect. Furthermore, the policy states, "When amendments to a contract are necessary, the contractor shall submit a proposed change order in writing to the project architect/engineer for review. If the project does not have an architect/engineer, the proposed change order shall be submitted to the superintendent or designee." *Id*. § F.2. Here, Root was the appropriate contact for Centegix to submit the Scope of Work Agreement. *See supra* at 14-15. Nothing in the public

---

[8] The other public contracting case cited by CMBE, *Nello L. Teer Co. v. North Carolina State Highway Comm'n*, 265 N.C. 1, 143 S.E.2d 247 (1965), is inapposite. In that case, the North Carolina Supreme Court held that a purported amendment to a state highway construction contract could not be enforced because the financial amount at issue in the amendment exceeded the threshold for the state's public bid requirements and the amendment had not been bid. 265 N.C. at 12, 143 S.E.2d at 255. In this case, the amendment reflected in the Scope of Work Agreement did not affect the financial amount of the underlying CMBE-Centegix contract. The remaining two cases cited by CMBE to support its authority argument, *O'Grady v. First Union National Bank*, 296 N.C. 212, 250 S.E.2d 587 (1978), and *Zimmerman v. Hogg & Allen. P.A.*, 286 N.C. 24, 209 S.E.2d 796 (1974), do not address public contracting issues, but instead generally discuss apparent authority.

record negated Root's authority to execute this amending document. Under these circumstances, Centegix was "in the exercise of reasonable care . . . justified in believing" that Root was authorized to execute the Scope of Work Agreement. *See Zimmerman v. Hogg & Allen, P.A.*, 286 N.C. 24, 31, 209 S.E.2d 795, 799 (1974).

        c.    <u>CMBE and Centegix Agreed to the "Additional Terms" in the Statement of Work, and Derek Root's Valid Execution of the Scope of Work Agreement Gave CMBE Knowledge of its Terms</u>.

In the memorandum supporting its motion to enjoin, CMBE argues that the arbitration clause contained in the Scope of Work Agreement is an "additional term[]," which Centegix did not attach to its response to the First RFP and, therefore, cannot be enforced. Memo. Supp. Mot. Enj. at 12-13. This argument, too, misses its mark. As with any contracting parties, CMBE and Centegix were free to amend their agreement by mutual assent. The CMBE Standard Contract Terms and Conditions expressly anticipate the possibility of amendment or modification of the parties "Contract Documents": "CMBE hereby expressly rejects all such provisions which supplement, modify or otherwise vary from the terms of the Contract Documents, and such provisions are superseded by the terms and conditions stated in the Contract Documents, *unless and until CMBE's authorized representatives expressly assent, in writing to such provisions.*" Compl. Ex. A at p. 19.. The parties' execution of the Scope of Work Agreement was permissible and consistent with this provision of the CMBE First RFP and Standard Contract Terms and Conditions.

As to the argument that CMBE did not know the terms of the Scope of Work Agreement, *see* Memo. Supp. Mot. Enj. at 13, Centegix having established that Derek Root validly executed the Scope of Work Agreement on CMBE's behalf, Root's knowledge of the Scope of Work

Agreement is imputed to his employer, CMBE. *Reinninger v. Prestige Fabricators, Inc.*, 136 N.C. App. 255, 261-62, 523 S.E.2d 720, 725 (1999).

3.  The Scope of Work Agreement Contains a Binding Arbitration Provision.

The Scope of Work Agreement contains a binding agreement to arbitrate. It provides: "Any controversy or claim arising out of or relating to this Agreement or breach thereof, including any dispute as to the enforceability of this arbitration provision" shall be decided in accordance with the Commercial Arbitration Rules of the AAA in Oconee County, Georgia. Memo. Supp. Mot. Enj., Ex. B, at p. 10. *See Grange Mut. Cas. Co. v. Woodard*, 861 F.3d 1224, 1231 (11th Cir. 2017) (applying Georgia law and holding contract language "must be afforded its literal meaning and plain ordinary words given their usual significance"); *RL Regi North Carolina, LLC v. Lighthouse Cove, LLC*, 367 N.C. 425, 428, 762 S.E.2d 188, 190 (2014) (determining the intent of the parties "by the plain meaning of the written terms").[9]

4.  The Parties' Agreement to Arbitrate Delegates the Issue of Arbitrability to the Arbitrator in "Clear and Unmistakable" Terms.

After establishing that the parties' Scope of Work Agreement includes a binding arbitration clause and considering the strong federal policy favoring arbitration, the next set of inquiries addresses the scope of the parties' agreement to arbitrate: (1) whether the arbitration clause, by its terms, reaches CMBE's claims in this lawsuit and (2) whether any "legal constraints external to the parties' agreement" prevent application of the agreement to require arbitration of CMBE's

---

[9] While state law governs the formation and existence of an agreement to arbitrate, *see Keena v. Groupon, Inc.*, 192 F. Supp. 3d 630, 634 (W.D.N.C. 2016), North Carolina's "strong policy" favoring arbitration "has led the North Carolina courts to conclude that 'where there is any doubt concerning the existence of an arbitration agreement, it should be resolved in favor of arbitration." *Hightower v. GMRI, Inc.*, 272 F.3d 239, 242 (4th Cir. 2001) (quoting *Martin v. Vance*, 133 N.C. App. 116, 514 S.E.2d 306, 309 (1999); *see also Moreno v. Expedia*, 2018 WL 3059617, *3 (W.D.N.C. June 20, 2018) (observing that, while state law governs formation of agreement to arbitrate, "due regard must be given to the federal policy favoring arbitration") (quoting *Cara's Notions v. Hallmark Cards*, 140 F.3d 566, 569 (4th Cir. 1998)). Similarly, Georgia's Arbitration Code reflects "a clear policy in favor of arbitration." *Order Homes, LLC v. Iverson*, 300 Ga. App. 332, 334-35, 685 S.E.2d 304, 307 (2009).

18

claims—that is, whether claims of the sort CMBE asserts here are subject to mandatory arbitration. *Mitsubishi Motors Corp. v. Solar Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S. Ct. 3346, 3355 (1985); *Reese v. Commercial Credit Corp.*, 955 F. Supp. 567, 570 (D.S.C. 1997); *Shotto v. Laub*, 632 F. Supp. 516, 523 (D. Md. 1986).

Here, however, CMBE and Centegix delegated to the arbitrator the task of determining whether the Scope of Work Agreement requires arbitration of their disputes. Included among those matters for the arbitrator's decision is "any dispute as to the enforceability of this arbitration provision." Memo. Supp. Mot. Enj., Ex. B, at p. 10. *Rent-A-Center*, 561 U.S. at 68-69 ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 1923 (1995) ("Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, . . . so the question, 'who has the primary power to decide arbitrability' turns upon what the parties agreed to about *that* matter.") (citations omitted; emphasis in original). The parties' clear and unmistakable language reflects their intent that the arbitrator decide the reach of the arbitration clause. *See id.* at 944, 115 S. Ct. at 1924 (requiring "clea[r] and unmistakabl[e]" evidence that the parties intended arbitration of the threshold issue). In *Rent-A-Center*, the Supreme Court concluded that a similar provision—providing that the arbitrator would decide "any dispute relating to the . . . enforceability . . . of this Agreement . . ."—amounted to an agreement to arbitrate threshold issues concerning the arbitration agreement. 561 U.S. at 68, 130 S. Ct. at 2777. The Court, therefore, should defer to the arbitrator to decide whether the agreement to arbitrate covers the subject matter of this dispute.

5.      In Any Event, the Scope of Work Agreement's Arbitration Clause Clearly Reaches CMBE's Claims Against Centegix.

"Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25, 103 S. Ct. at 941. Even if this Court decides to address the reach of the parties' agreement to arbitrate, CMBE's agreement to arbitrate "[a]ny controversy or claim arising out of or relating to this Agreement or a breach thereof" is a broad agreement to arbitrate reaching all of CMBE's breach of contract and breach of warranty claims, and its purported Unfair and Deceptive Trade Practices Act claim, which relates directly to the parties' agreement. *See Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92-93 (4th Cir. 1996) (distinguishing between "broad" and "narrow" arbitration clauses and applying the presumption in favor of arbitration to the former).

And nothing in the nature of CMBE's breach of contract, breach of warranty, and Unfair and Deceptive Trade Practices Act claims exempts them from mandatory, binding arbitration under the parties' arbitration clause. *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411 (4th Cir. 2000) (acknowledging stay pending arbitration of breach of contract and breach of warranty claims and enforcing arbitration award); *Klopfer v. Queens Gap Mountain, LLC*, 816 F. Supp. 2d 281 (W.D.N.C. 2011) (compelling arbitration of breach of warranty and N.C. Unfair and Deceptive Trade Practices Act claims).

Accordingly, if this Court decides to address the merits of the parties' arbitration agreement, the Court should enforce the Scope of Work Agreement and stay this action, pursuant to Section 3 of the FAA, pending conclusion of arbitration.

C. Alternatively, If the Court Concludes the Arbitration Clause in the Statement of Work Is Not Enforceable, CMBE's Standard Terms and Conditions Require Dismissal for Failure to Mediate.

Centegix has established that the Statement of Work Agreement is a valid amendment of the parties' initial contract. Nonetheless, if the Court decides the Scope of Work Agreement and its arbitration clause should not be enforced, the mediation provision contained in CMBE's Standard Contract Terms and Conditions requires that the Court dismiss this lawsuit until the parties have engaged in mediation administered by the American Arbitration Association. The Standard Terms and Conditions are contained both in the First RFP and in CMBE's purchase orders. The language of this provision is plain:

> **MEDIATION:** If a dispute arises out of or relates to the Contract, or the breach of the Contract, and if the dispute cannot be settled through negotiation, the parties agree to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Rules *before resorting to litigation.*

Compl. Ex. A at p. 23 § 40 (emphasis added).

This Court construed a similar contract provision in *Hometown Services, Inc. v. Equitylock Solutions, Inc.*, 2014 WL 4406973 (W.D.N.C. Sept. 5, 2014), and concluded that dismissal was proper. *Id.* at *2-3. The Court observed, "The Plaintiff's reason for why it failed to conduct mediation prior to the institution of this suit is irrelevant, because mediation was required *prior* to the commencement of this suit." *Id.* at *2 (emphasis in original); *accord Mortimer v. First Mount Vernon Industrial Loan Ass'n*, 2003 WL 23305155, *2-3 (D. Md. May 19, 2003) (dismissing lawsuit without prejudice pending compliance with mandatory mediation provision). Despite claiming that its Standard Terms & Conditions govern its claims against Centegix, CMBE simply ignored the mediation requirement in those terms and conditions. It made no attempt to mediate the dispute. *See* Harrington Decl. ¶ 5. CMBE's selective invocation of its Terms & Conditions

should be rejected. If the Court concludes that this dispute is not subject to the arbitration clause contained in the parties Scope of Work Agreement, the action must be dismissed, pursuant to Rules 12(b)(1) and 12(b)(6), or, alternatively, stayed pending the parties' mediation under the Standard Terms & Conditions.

D. **CMBE's NCUDTPA Claim Sounds in Fraud, and CMBE Has Failed to Plead Fraud with Particularity.**

Finally, because Centegix has presented a motion to dismiss based on CMBE's failure to mediate before filing this lawsuit, Centegix must preserve its alternative motion for dismissal of CMBE's NCUDPTA claim. *See* Fed. R. Civ. P. 12(g)-(h). Centegix does not intend any waiver of its rights to arbitrate or mediate this dispute by asserting this alternative argument. The NCUDTPA claim (CMBE's 6th Claim for Relief), is subject to dismissal under Rule 12(b)(6) because it is indistinct from CMBE's contract and warranty claims and CMBE fails to plead the alleged "fraud" underlying this claim with particularity. *See Hancock v. Americo Financial Life & Annuity Insurance Co.*, 272 F. Supp. 3d 763, 777-78 (E.D.N.C. 2017).

CONCLUSION

For the foregoing reasons, the Court should grant Centegix's motion and stay this litigation pending the determination of the United States District Court for the Middle District of Georgia on defendant's Petition to Compel Arbitration. Alternatively, Centegix asks that the Court determine that all issues presented in this matter are subject to arbitration and stay this action pending the conclusion of arbitration in Georgia. If the Court concludes that CMBE's claims are not subject to arbitration, this action must be dismissed because of CMBE's failure to engage in mediation, as mandated by its transaction document, before filing this lawsuit. Finally, CMBE's claim under the NCUDTPA is subject to dismissal because it lacks any particularized allegations

of fraud or any well-pleaded factual matter to distinguish it from CMBE's contract and warranty claims.

This 26th day of May, 2020.

s/ Robert E. Harrington
Robert E. Harrington
N.C. Bar No. 26967
rharrington@robinsonbradshaw.com

Cary B. Davis
N.C. Bar No. 36172
cdavis@robinsonbradshaw.com

Gabriel Wright
N.C. Bar No. 52472
gwright@robinsonbradshaw.com

Attorneys for Defendant 34 ED, LLC d/b/a CENTEGIX

ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
(704) 377-2536

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2020, I electronically filed the foregoing **DEFENDANT 34 ED, LLC. d/b/a CENTEGIX'S MEMORANDUM IN SUPPORT OF MOTION TO STAY PENDING ARBITRATION AND, ALTERNATIVELY, TO DISMISS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

> Hope A. Root
> Charlotte-Mecklenburg Board of Education
> 600 E. Fourth Street, 5th Floor
> Charlotte, North Carolina 28202
> hopea.root@cms.k12.nc.us
>
> Deja D. Kemp
> Charlotte-Mecklenburg Board of Education
> 600 E. Fourth Street, 5th Floor
> Charlotte, North Carolina 28202
> deja1.kemp@cms.k12.nc.us
>
> *Attorneys for Plaintiff*

This 26th day of May, 2020

> s/ Robert E. Harrington
> Robert E. Harrington