IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20CV259

| | | |
|---|---|---|
| THE CHARLOTTE MECKLENBURG BOARD OF EDUCATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER |
| 34 ED, LLC d/b/a CENTEGIX, | ) ) ) | |
| Defendant. | ) ) | |

This matter is before the Court upon the Plaintiff's Motion to Enjoin Arbitration Proceedings (Doc. No. 3) and the Defendant's Motion to Stay or Dismiss (Doc. No. 5). Both motions have been fully briefed and are ripe for disposition.

I.     FACTUAL AND PROCEDURAL BACKGROUND

In August of 2018, Plaintiff Charlotte-Mecklenburg Board of Education ("CMS") issued a Request for Proposals ("RFP") to invite vendors to bid on a goods and services contract for a crisis alert and management system for use in its public schools. (Compl. at ¶ 6). The RFP provided important specifications for the proposed system and contained the following pertinent language:

> "ACCEPTANCE OF BID
> If any or all parts of this bid are accepted, an authorized representative of the Charlotte-Mecklenburg Board of Education shall affix their signature hereto and this document and the provisions of the Instructions to Bidders, special terms and conditions specific to this Invitation for Bids, the specifications, and The Charlotte Mecklenburg Board of Education Standard Terms and Conditions shall then constitute the written agreement between the parties. A copy of this acceptance will be forwarded to the successful bidder(s)." (Doc. No. 3-7, Ex. E, p.1).

> "All bids are subject to the Provisions of the Instructions to the Bidders, special terms and conditions specific to this Invitation for Bids, the specifications, and The

1

Charlotte-Mecklenburg Board of Education Standard Contract Terms and Conditions. The Charlotte-Mecklenburg Board of Education objects to and will not evaluate or consider any additional terms and conditions submitted with a bidder response. This applies to any language appearing in or attached to the document as part of the offeror's response. **DO NOT ATTACH ANY ADDITIONAL TERMS AND CONDITIONS.** *By execution and delivery of this document, the offeror agrees that any additional terms and conditions, whether submitted purposely or inadvertently, shall have no force or effect.*" (emphasis added) (*Id*. at p. 16).

"No additional or supplemental provision or provisions in variance herewith that may appear in Seller's quotation, acknowledgment, invoice, or in any other communication from Seller to CMBE shall be deemed accepted or binding on CMBE. CMBE hereby expressly rejects all such provisions which supplement, modify or otherwise vary from the terms of the Contract Documents, unless and until CMBE's authorized representatives expressly assent, in writing, to such provisions." (*Id.* at p.19).

On September 5, 2018, Defendant CENTEGIX submitted its Proposal and Response to RFP ("the Bid"), and affixed its signature, signifying its acceptance of the conditions in the RFP. (Compl. at ¶ 8). Pursuant to the conditions in the RFP, CENTEGIX did not attach any additional terms or conditions with its bid. CMS accepted CENTEGIX's Bid and awarded CENTEGIX the RFP on November 13, 2018. (*Id.* at ¶ 12). Unbeknownst to CMS, three days later, Daniel Dooley, a CENTEGIX officer, sent CMS' Chief Technology Officer, Derek Root, a Scope of Work ("SOW") document to sign. (Doc. No. 3-10, Ex. H, at ¶¶ 7-8). Derek Root signed the SOW on December 4, 2018. The SOW was not forwarded to the Procurement Department—the Department responsible for the school district's competitive bidding procedures. (Doc. No. 3-8, Ex. F at ¶ 16; Doc. No. 3-9, Ex. G, at ¶ 16). The SOW contains a broad arbitration clause:

> Any controversy or claim arising out of or relating to this Agreement or breach thereof, including any dispute as to the enforceability of this arbitration provision shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, in Oconee County, Georgia.

(Doc. No. 3-4, Ex. B, at p. 10).

After being awarded the RFP, CENTEGIX began installing a system with classroom cameras, enhanced audio, and crisis alert and management system at the pilot school. (Compl. at ¶ 18). CENTEGIX also installed the crisis alert and management system in all CMS high schools. (*Id*. at ¶ 19). Shortly thereafter, CMS began experiencing multiple system failures of CENTEGIX's system. (*Id*. at ¶¶ 27-29). Based on multiple system failures and the results of CMS' independent quality testing of the system, on or about January 10, 2020, CMS gave CENTEGIX thirty (30) days to replace and/or repair equipment and system operations to perform as represented and warranted by CENTEGIX. (*Id.* at ¶ 27). CENTEGIX failed to correct the defects.

On April 29, 2020, CMS filed its Complaint in this action alleging claims against the Defendant for breach of contract, breach of warranties, and violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTP"). Later that same day, CENTEGIX filed a Demand for Arbitration with the American Arbitration Association ("AAA"), requesting a hearing in Oconee County, Georgia, based on the arbitration clause in the SOW, and seeking to recover the amount it alleges remains due from CMS for the crisis alert system. Despite the pending action in this Court, CENTEGIX filed a Petition to Compel Arbitration in the United States District Court for the Middle District of Georgia, Athens Division (the "GA case") (Civil Action No.: 3:20-cv-00054-CAR) on May 4, 2020. On May 7, 2020, CENTEGIX filed a Motion to Compel Arbitration in the GA case. On May 11, 2020, CMS filed its Motion in this Court to enjoin the arbitration proceedings. Thereafter, CENTEGIX filed a Motion to Stay or, Alternatively, to Dismiss this case.

## II. DISCUSSION

### A. Defendant's Motion to Stay pending the Georgia court's decision on its Motion to Compel Arbitration

The Defendant seeks to stay this action pending the Georgia court's decision on its Motion to Compel Arbitration. Where the same parties have filed similar lawsuits in different federal fora, courts in the Fourth Circuit follow the first-filed rule. *See Learning Network, Inc. v. Discovery Commc'ns, Inc*., 2001 WL 627618, at *3 (4th Cir. 2001) (unpublished); *Nutrition & Fitness, Inc. v. Blue Stuff, Inc.*, 264 F. Supp. 2d 357, 360 (W.D.N.C. 2003). Courts use three factors in determining whether to apply the first-filed rule: 1) the chronology of the filings, 2) the similarity of the parties involved, and 3) the similarity of the issues at stake. *Nutrition & Fitness, Inc.,* 264 F. Supp. 2d at 360. There is no dispute that the action in this Court is the first to be filed. Moreover, the same parties and issues are involved in both actions.

The Fourth Circuit has recognized two categories of exceptions to the first-filed rule: (1) when the balance of convenience weighs in favor of the second court; and (2) under special circumstances, particularly when there has been an anticipatory filing of a lawsuit under the threat of litigation in another court. *See Family Dollar Stores, Inc. v. Overseas Direct Imp. Co*., Ltd., No. 3:10-cv-278, 2011 WL 148264, *3 (W.D.N.C. Jan. 18, 2011) citing *Learning Network Inc.*, 2001 WL 627618, at *3. CENTEGIX contends that this Court should make an exception to the first-filed rule because the Georgia court is the only court that can give complete relief to CENTEGIX by compelling arbitration.[1] In support of its position that under the special

---

[1] While the Fourth Circuit has not made a definite ruling on whether a district court has the authority to compel arbitration outside of its geographic jurisdiction, the majority of district courts in the Fourth Circuit have consistently taken the position that a court may not compel arbitration outside its district. *See American Int'l. Specialty Lines Ins. Co. v. A.T. Massey Coal Co., Inc.* 628 F. Supp. 2d 674, 683 (E.D. Va. 2009) (adopting the majority rule that a court may not compel arbitration outside of its district and observing that "the Fourth Circuit

4

circumstances of this case this Court should depart from the first-filed rule, the Defendant relies upon *Jefferson Pilot Life Ins. Co. v. Griffin*, No. 1:07CV0096, 2008 WL 2485598 (M.D.N.C. June 16, 2008). In *Griffin*, the plaintiff sued the defendant in federal district court in Arizona (*Griffin v. Lincoln Nat'l Corp.*, No. 06-2886, 2007 WL 2713237 (D. Ariz. Sept. 17, 2007)) claiming breach of contract and various torts. In response, the defendants moved to stay pending arbitration and filed an action in the United States District Court for the Middle District of North Carolina to declare the parties' arbitration enforceable and compel arbitration in North Carolina under the parties' arbitration agreement. The Arizona court concluded that the arbitration issues in both courts were identical and that the presence of the same parties and identical issues "raise[d] issues of comity." 2007 WL 2713237, at *4. The court acknowledged the risk of inconsistent rulings and the inefficient use of judicial resources in the absence of a stay. *Id.* The court also questioned whether it could compel arbitration in North Carolina. *Id.* at *2, n.1. The court stayed the Arizona lawsuit pending a decision from the North Carolina federal court. The Middle District of North Carolina, in turn, considered the application of the first-filed rule and concluded, under the circumstances, that it should decide the issue of arbitrability. *Griffin*, 2008 WL 2485598, *5. However, in so concluding, the court relied heavily on the fact that the Arizona court had already stayed the litigation:

> In reaching the conclusion that departure from the first-filed rule is appropriate in this instance, the Court first notes that the Arizona court in its discretion declined to exercise its jurisdiction over the questions surrounding the arbitration provision and deferred resolution of the issues presented until this Court had the opportunity to entertain whether or not it would exercise jurisdiction over the case. *See*, *Griffin*, 2007 U.S. Dist. LEXIS 69009, 2007 WL 2713237, at *4-5 (stating that "the comity doctrine vests a district court with discretion to decline jurisdiction over a case in order to avoid parallel litigation in a coordinate court"). In light of the Arizona

has strongly implied that it would align itself with the majority position if it were squarely presented with the issue."); *see also Southern Concrete Products, Inc. v. ARCO Design/Build, Inc.*, No. 1:11cv194, 2012 WL 1067906 at *8 (W.D.N.C. March 29, 2010).

5

court's deference, this Court cannot agree that entering a stay or transferring the case back to the Arizona court would serve the purposes of judicial economy and effective disposition of disputes underlying the first-filed rule.

*Id*. at * 4. No such circumstances exist here. Accordingly, this court declines to find an exception to the first-filed rule.

Moreover, the Court feels compelled to note that it was CENTEGIX that caused the issue of parallel actions. Once CMS filed this lawsuit, CENTEGIX could have filed its Motion to Stay this action and allowed this Court to rule on the issue of whether there is a contract to arbitrate. If the Court decided in the affirmative, it could stay this litigation pending arbitration. Should CMS then refuse to submit to arbitration, CENTEGIX could have then filed the Petition to Compel Arbitration in Georgia.

Having decided to decline to depart from the first-filed rule, the Court must next proceed to address Plaintiff's Motion to Enjoin Arbitration Proceedings.

### B. Plaintiff's Motion to Enjoin Arbitration

Plaintiff has moved the Court to enter a Preliminary Injunction to enjoin the arbitration proceedings demanded by Defendant. As noted above, though the Fourth Circuit has not specifically ruled on whether a district court can compel arbitration outside of its geographic jurisdiction, the court can enjoin an arbitration proceeding if a party never agreed to submit a matter to arbitration. *See UBS Fin. Servs. v. Carilion Clinic*, 880 F. Supp. 2d 724, 728-729 (E.D.Va. 2012) ("The Federal Arbitration Act ("FAA") authorizes district courts to compel arbitration when a party has breached an agreement to arbitrate. *See* 9 U.S.C. § 4. While the FAA only explicitly empowers courts to compel arbitrations, district courts in this circuit have also routinely enjoined proceedings when the parties never agreed to submit their disputes to arbitration.") (citations omitted.)

6

To obtain a preliminary injunction, a moving party must show: (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm that is neither remote nor speculative but actual and imminent if injunction is not granted; (3) the balance of equities favor its position, i.e., the harm it will suffer if injunction is not granted outweighs the detriment the defendant will suffer if it is; and (4) the relief sought is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Regarding likelihood of success on the merits, the issue before the court is whether CMS entered into a contract to arbitrate when the SOW document was signed by Mr. Root. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (quotations omitted); *see also Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd., et al.*, 944 F.3d 225, 234 (4th Cir. 2019) ("Section 4 [of the Federal Arbitration Act] thus requires that the district court — rather than an arbitrator — decide whether the parties have formed an agreement to arbitrate"). Even though parties can agree to have an arbitrator make arbitrability decisions, it does not "preclude a Court from deciding that a party never made an agreement to arbitrate any issue….) *Berkeley*, 944 F.3d at 234 n.9. The United States Supreme Court has also affirmed the fundamental principle that it is the responsibility of the court, not the arbitrator, to determine the threshold issue of whether a challenged arbitration clause is valid. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 529 (2019) ("To be sure, before referring a dispute to an arbitrator, *the court* determines whether a valid arbitration agreement exists.") (emphasis added). The party seeking to compel arbitration has the burden of proving the existence of a valid arbitration agreement. *Fastener Corp. of Am. v. Asheboro Elastics Corp.*, 1:12-CV-1296, 2013 WL 3227665, *2 (M.D.N.C. June 25, 2013).

Defendant CENTEGIX argues that the SOW amended the original written contract formed between the parties when Plaintiff accepted Defendant's bid.[2] CMS contends that no mutual or valid agreement to arbitrate was formed between the parties because Derek Root had no actual or apparent authority to bind CMS, and Defendant was charged with this knowledge and could not have reasonably believed that Mr. Root had such authority.

Whether an agent possesses actual or apparent authority to bind the principal to an arbitration provision is "a question for a factfinder where the evidence is either conflicting or admits of more than one inference." *Berkeley Cty. Sch. Dist.*, 944 F.3d at 238. (quotations omitted). Accordingly, the Court must employ a summary judgment standard and determine whether there are genuine issues of material fact regarding the existence of the agreement to arbitrate.[3] *Id*. at 234. In applying such standard:

> [T]he court is entitled to consider materials other than the complaint and its supporting documents. *See Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 86 (4th Cir. 2016) (evaluating materials outside of complaint in assessing motion to compel arbitration). If the record reveals a genuine dispute of material fact "regarding the existence of an agreement to arbitrate," *see Chorley Enters., Inc.*, 807 F.3d at 564, the "court shall proceed summarily" and conduct a trial on the motion to compel arbitration, *see* 9 U.S.C. § 4. A factual dispute is material if the resolution thereof "might affect the outcome of the [motion] under the governing law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Rowland v. Minnesota Life Ins. Co*., No. 5:19-CV-00069, 2020 WL 534499, * 8 (W.D.N.C. Feb. 3, 2020).

---

[2] Contrary to Defendant's argument, the SOW itself states that it is the entire agreement between the parties and does not state it is an amendment to an existing contract. Moreover, the SOW does not name, refer to, or otherwise incorporate the bidding documents or their related purchase orders.

[3] The *Berkeley Cty. Sch. Dist*. case addressed this standard within the context of a motion to compel arbitration pursuant to Section 4 of Title 9 of the FAA. While there is no motion to compel before this Court, the same threshold issue exists in the Plaintiff's Motion to Enjoin, that is, whether CMS entered into an agreement to arbitrate.

In determining whether an agreement to arbitrate was formed, the Court must look to state law contract principles. *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005). The North Carolina Supreme Court [4] has held that the doctrine of apparent authority does not apply when a party could have determined the agent's authority by examining a public record. *O'Grady v. First Union Nat'l Bank*, 250 S.E.2d 587, 596 (N.C. 1978). In *O'Grady*, the court refused to apply the doctrine of apparent authority to a power of attorney that was required by state statute to be recorded, stating: "a third party is deemed to have notice of the nature and extent of the agent's authority." *Id.*; *see also L&S Leasing, Inc. v. City of Winston-Salem*, 471 S.E.2d 118, 120-21(N.C. Ct. App. 996) (holding that where a City Code, which is a matter of public record, limited contracting power to employees who had been designated authority by resolution, the city could not be bound by the city's Real Estate Supervisor); *Cmty. Projects for Students, Inc. v. Wilder*, 298 S.E.2d 434, 435-36 (N.C. Ct. App. 1982) ("Those who deal with public officials are deemed to have notice of the nature and extent of such officials to bind their principal.").

North Carolina General Statutes dictate that CMS must contract through the statutory bidding process. *See* N.C. Gen. Stat. § 115C-522. CMS has adopted policies to comply with its statutory duties and set forth competitive bidding procedures to fulfill its legal obligations. CMS Policy DJ, entitled "Purchasing/Contracting," sets forth the procurement procedure and approval authority for "[a]ll supplies, equipment, materials, services and real property for the school system… ." (Doc. No. 12-12, Ex. K, ¶ 5, Attach. 1). Section B of Policy DJ states that only the

---

[4] North Carolina law governs this dispute. Under North Carolina's choice-of law principles, "the interpretation of a contract" including the question of formation, "is governed by the law of the place where the contract was made." *Schwarz v. St. Jude Med., Inc*., 802 S.E.2d 783, 788 (N.C. App. 2017). "[A] contract is made in the place where the last act necessary to make it binding occurred." *Id.* at 790. Importantly, the last act necessary to contract formation usually occurs at the place of acceptance. *Id.* Here, the last act necessary to form this purported contract was Derek Root's signature, which occurred in North Carolina.

9

Board Chairperson or Superintendent, or their designee, has contract approval authority. Section D of that Policy specifically outlines the process for designating approval authority and states:

> the Superintendent or Board Chairperson "shall exercise his/her authority to designate individuals who are authorized to approve and sign contracts only by regulation or written memorandum of delegation provided to the members of the Board of Education, the Chief Financial Officer and the Board Attorney."

(*Id.*). These policies are available to the public at https://go.boarddocs.com/nc/cmsnc/Board.nsf/Public#. (*Id*. at Ex. K, ¶ 9). State law and CMS policies are all matters of public record and thus CENTEGIX is charged with notice of these. Derek Root was neither authorized by statute or policy, nor designated by a Board Chairperson or the Superintendent, to approve and sign contracts on behalf of CMS. (Doc. No. 12-11, Ex. J, ¶¶ 19-20).

CENTEGIX cites the following provision from CMS' contract Terms and Conditions as evidence that Derek Root could change or amend the contract:

> CMBE [Charlotte Mecklenburg Board of Education] hereby expressly rejects all such provisions which supplement, modify, or otherwise vary the terms of the Contract Documents, and such provisions are superseded by the terms and conditions stated in the Contract Documents, *unless and until CMBE's authorized representatives expressly assent, in writing, to such provisions*.

(Doc. No. 12-8, Ex. G, p. 19) (emphasis added). However, this very language shows that CENTEGIX was put on notice that only *authorized* representatives could expressly assent in writing to a change in terms and conditions. Board Policy DJ clearly and unmistakably sets forth the authorizing representatives – the Superintendent or Board Chair – and the process for designating another individual. For Mr. Root to have been given authority to modify the standard contract terms and conditions, there would have been a regulation or written memorandum of delegation provided to the members of the Board of Education, the Chief Financial Officer, and the Board Attorney. (Doc. No. 12-12, Ex. K, Attach. 1).

10

Even outside of the public agency realm, CENTEGIX's belief that Mr. Root could bind CMS must have been a reasonable one. *See Zimmerman v. Hogg & Allen*, 209 S.E.2d 795, 799 (N.C. 1974) ("[T]he determination of a principal's liability in any particular case must be determined by what authority the third person in the exercise of reasonable care was justified in believing that the principal had, under the circumstances, conferred upon his agent."). CENTEGIX contends that CMS's Superintendent told CENTEGIX that Root had responsibility for the project and that CETEGIX should go through Root on all project matters. (Doc. No. 5-1, Dooley Decl. ¶ 6). However, even if Root were the project coordinator as claimed by CENTEGIX, the CMS Terms and Conditions limit what modifications a project coordinator can make. The Terms and Conditions CENTEGIX agreed to as part of the bidding process state at paragraph 25:

> **25. Contract Modifications**
> The Contract may be amended only by written amendment duly executed by both CMBE and Seller. However, *minor modifications* may be made by CMBE Project Coordinator to take advantage of unforeseen opportunities that: (a) do not change the intent of the Contract or scope of Seller's performance; (b) do not increase Seller's total compensation or method of payment; and (c) either improve the overall quality of the product or service to CMBE without increasing the cost, or reduce the total cost of the product or service without reducing the quantity or quality. All such minor modifications to the Contract must be recorded in writing and signed by both the Project Coordinator and seller, and placed on file with the Contract. No price adjustments will be made unless the procedure has been included in the Contract and a maximum allowable amount stipulated.

(Doc. No. 12-8, Ex. G, p. 21) (emphasis added). The fact that the SOW contains a Georgia choice of law and arbitration provisions, along with purportedly cancelling product warranties and other massive changes to the terms and conditions, takes the SOW out of the realm of minor contract modifications. CENTEGIX was aware, by virtue of this contract provision, that a Project Coordinator's authority was limited. In addition, the RFP clearly and explicitly stated:

11

"**DO NOT ATTACH ANY ADDITIONAL TERMS AND CONDITIONS.** By execution and delivery of this document, the offeror agrees that any additional terms and conditions, whether submitted purposely or inadvertently, shall have no force or effect." (Doc. No. 3-7, p.16). Thus, it was unreasonable for CENTEGIX to believe that less than a week after it had been awarded a contract through the public bidding contest a Project Coordinator could undo that entire statutorily-mandated process by signing a short agreement materially modifying the contract between the parties.

In sum, the CMS contract with CENTEGIX was entered into through the statutorily mandated public bidding process, and that process could not be superseded by a SOW signed by a CMS employee who was not an authorized agent of CMS. CENTEGIX was unequivocally on notice of the bidding statutes and the issues surrounding authority. Accordingly, there is no genuine issue of material fact that the SOW with its arbitration clause did not amend or alter the contract entered into between the parties when CMS accepted Defendant's bid.[5] Plaintiff is likely to succeed on the merits as an arbitration agreement was never formed.

CMS will suffer irreparable harm if it is forced to arbitrate a contract to which it did not agree. Being compelled to arbitrate a dispute where the parties have not agreed to arbitrate constitutes irreparable harm *per se*. *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010) (existence of irreparable harm "is beyond dispute" if a party is compelled to arbitrate claims without having agreed to arbitration); *Paine Webber Inc. v. Hartmann*, 921 F.2d 507, 514 (3d Cir. 1990) *overruled on other grounds*, *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 85 (2002) ("per se irreparable harm" results "if a court were to abdicate its responsibility to

---

[5] There are other reasons why the SOW and its arbitration clause did not amend the original contract between the parties, however, the Court finds it unnecessary to address these other arguments given its findings regarding apparent agency.

12

determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority."). Forcing a party to submit to arbitration against its will deprives it of the constitutional right to a jury trial on issues of fact, and obligates it to spend money and resources in arbitration which might not be compensable by a monetary award of attorneys' fees or damages. *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Rels*., 107 F.3d 979, 985 (2d Cir. 1997).

In balancing the equities, the Court finds that the harm CMS will suffer if the injunction is not granted certainly outweighs the minimal harm CENTEGIX will suffer if the injunction is granted. *See Inception Mining, Inc. v. Danzig, Ltd.*, 312 F. Supp. 3d 1271, 1287 (D. Utah 2018) (finding that "the irreparable harm of forcing the…Plaintiffs to submit to arbitration to which they did not agree outweighs any harm to Defendants caused by a preliminary stay of the… Arbitration."). The Court likewise finds that the relief CMS seeks is in the public interest. Courts have recognized that "[f]orcing parties to arbitrate when they did not agree to arbitrate would generate powerful disincentives to participate in arbitration and would lower the public's confidence in arbitration as an avenue for dispute resolution." *Id.* Here, if CMS is forced to arbitrate when it did not agree to do so, it will be forced to spend significant public funds in an arbitration proceeding in Georgia. The public's interest is served by ensuring these finite public resources are not wasted.

CENTEGIX argues that Plaintiff's Motion to Enjoin Arbitration Proceedings is moot because it informed the AAA that it will await a decision from the courts, and the AAA has placed the arbitration proceeding in abeyance. However, the law is well-settled that "a defendant's voluntary cessation of a challenged practice ordinarily does not deprive a federal court of its power to determine the legality of the practice." *Deal v. Mercer Cty. Bd. of Educ.*,

911 F.3d 183, 191 (4th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)); *Atl. Pinstriping, LLC v. Atl. Pinstriping Triad, LLC*, No. 3:16CV547, 2016 WL 4766496, *1 (W.D.N.C. Sept. 12, 2016) ("voluntary discontinuance of challenged activities by a defendant does not necessarily moot a lawsuit.") (citations omitted). Courts are especially wary of attempts to force mootness on an unwilling plaintiff by the defendant taking unilateral, voluntary action. *Brown v. Transurban USA. Inc*., 144 F. Supp. 3d 809, 828 (E.D. Va. 2015). Additionally, when a defendant voluntarily ceases a challenged action which has created the controversy, "the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness." *Laidlaw*, 528 U.S. at 170-71. This is especially true when the Defendant maintains the legality of the challenged practice despite its voluntary abandonment of a course of conduct. *Brown*, 144 F. Supp. 3d at 828.

Here, Defendant's temporary abandonment of its arbitration demand is an attempt to "force mootness" on CMS by taking unilateral, voluntary action. Defendant has not met its "heavy burden" to show the challenged conduct would not be expected to recur. The Court finds that this matter is not moot, as there is nothing preventing CENTEGIX from contacting the AAA at any moment to reverse course. Further, the AAA can end the abeyance at any time, because it is not a formal order. Finally, the Georgia action, from which CMS also seeks relief, is still pending. CENTEGIX has not withdrawn its Petition or Motion to Compel from that Court.

**C. Defendant's Motion to Stay or Dismiss pending mediation**

Having decided that the parties did not agree to arbitrate this dispute, the Court must address Defendant's argument that CMS's Standard Terms and Conditions require dismissal of

this case for failure to mediate. The Standard Terms and Conditions contained both in the First RFP and in CMBE's purchase orders provide:

> **MEDIATION:** If a dispute arises out of or relates to the Contract, or the breach of the Contract, and if the dispute cannot be settled through negotiation, the parties agree to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Rules before resorting to litigation.

(Compl., Ex. A at p. 23 § 40).

CMS contends that CENTEGIX has waived or should be estopped from asserting any right to demand pre-suit mediation because both parties agreed early in the negotiation process that mediation would likely be futile. CENTEGIX contends that it never agreed to forego mediation prior to the commencement of a lawsuit. The undisputed fact is that Plaintiff did not make any efforts to formally mediate with Defendant before filing this lawsuit, as agreed in the Standard Terms and Conditions. Accordingly, the Court will exercise its discretion to stay this litigation pending mediation. *See North Carolina Eye Bank, Inc. v. High Energy Ozone, LLC*, No. 1:19CV614, 2019 WL 6730961 (M.D.N.C. Dec. 11, 2019) (rejecting claims of waiver and estoppel regarding a contractual mediation provision, noting that Plaintiff never made any formal efforts to mediate prior to filing suit, and staying litigation pending mediation).

Because the Court is staying this matter pending mediation, the Court will defer ruling on Defendant's Motion to Dismiss the UDTP claim pursuant to Rule 12(b)(6).

IT IS THEREFORE ORDERED that Plaintiff's Motion to Enjoin Arbitration Proceedings (Doc. No. 3) is hereby granted;

IT IS FURTHER ORDERED that Defendant's Motion to Stay or Dismiss (Doc. No. 5) is granted in part and denied in part. The motion is granted only to the extent that this matter will

be stayed pending mediation. The parties are directed to pursue mediation forthwith and report to the Court within 45 days as to the status of scheduling mediation.

Signed: July 14, 2020

Graham C. Mullen
United States District Judge